STATE OF MAINE                                    DISTRICT COURT

Sagadahoc, ss.                                    Location: West Bath


MARILYN RENO

                    Plaintiff

v.                                    Docket No. WESDC-CV-13-069

THOMAS RAMSEY

                    Defendant

## DECISION AND JUDGMENT

This civil case came to trial December 15 and 16, 2014, with both parties presenting evidence in the form of sworn testimony and exhibits.

. Plaintiff presented her own testimony and that of her retained expert contractor, Jack Shaw, and cross-examination of Defendant Thomas Ramsey. Defendant presented his own testimony and that of Bruce Engert, the code enforcement officer for the Town of Woolwich, and Defendant's retained expert, Gerald Mitchell Jr. Joint Trial Exhibits 1-18 were admitted by agreement as was Plaintiff's exhibit 1 (consisting of a letter from Plaintiff's former attorney to Defendant dated September 27, 2011).

After the trial, the parties presented further submissions, after which the court took the case under advisement.

Based on the entire record, the court adopts the following findings of fact and conclusions of law, and renders judgment as set forth below.

1.      Plaintiff Marilyn Reno is the owner of a parcel of real estate located at 24 Mad Mountain Road in the town of Woolwich. She acquired that lot and an abutting parcel) in 1997 and 2001. Her initial purpose in acquiring the lots was to obtain a right of way to access other property she owned on Mad Mountain Road. However, the Plaintiff subsequently

1

decided to construct a residential dwelling at the 24 Mad Mountain Road lot with the intent of moving there from her current residence, which she considered too large, given her age and health. She is a 75-year-old widow and relies on social security, supplemented by rental income from other properties she owns in Woolwich. She has family members living in the immediate neighborhood.

2. Her long-term plan was to build a single story home that would be smaller and more accessible than her current residence, with the first steps being to clear the lot and install a septic system. She chose to act as her own general contractor, to hire friends and family members to do as much of the work as possible, in order to keep construction costs within her budget.

3. Plaintiff hired Daniel Colby, a licensed surveyor and septic system designer. Mr. Colby surveyed a line dividing her parcel into two building lots, and prepared the design for a subsurface waste disposal system on one of the parcels. His design, attached to a permit application, was originally dated November 10, 2006. The application, however, was not submitted to the local codes office for approval at that time.

4. It was not until 2010 that Plaintiff began to start work, and the applicable code required a more recent date on the permit application. Mr. Colby therefore reviewed and re-signed the application on July 23, 2010. The permit was approved by the local code enforcement officer, Bruce Engert.

5. Work on the project began with Plaintiff hiring several family members and friends to help clear the site, cutting trees and hauling the logs and brush from the location for the house and the septic system. Plaintiff owned a small backhoe, which her helpers used for this work.

6. In July or August 2010, the Defendant, who lives nearby, came to the site and

2

offered his services as an excavation contractor. Plaintiff and Defendant have known each other for many years; Defendant is a good friend of one or more of the Plaintiff's sons.

7. The work that the parties specifically discussed and eventually agreed upon called for Defendant to install a septic system for the home that Plaintiff planned to build on the lot, and also to install a driveway from the public road to the area where the home would be sited. Defendant proposed, and the Plaintiff agreed, that he would be paid on a time and materials basis for his work. Virtually all of the work entailed in installing a septic system and a driveway requires the use of machinery and equipment, so Defendant and Plaintiff agreed on an hourly rate of $70, including use of machinery and equipment.

8. Although Plaintiff claimed at trial that she never learned of the $70 per hour rate until September 21, 2010 when the Defendant told her of that rate, the notes and records she maintained from when Defendant began work in August 2010 indicate otherwise. See bottom of page 1 of Joint Trial Exhibit 8 ($3,500 paid to Defendant for groundwork between 8/12 and 8/31 for 50 hours and calendar entry for October 10, 2010 (payment to Defendant for $530 for 7.57 hours).

9. The parties agree that Defendant gave Plaintiff an oral estimate of the cost of the septic system, based on the agreed-on hourly rate of $70, but they disagree on what the estimate was, with Plaintiff testifying she was given a range of $9,000 to $10,000, and Defendant testifying he gave her an estimate of $12,000 to $15,000. From this, the court infers he more likely than not gave her two estimates—the lower one initially, and the higher one after he had actually costed out the time and materials required to complete the system according to Colby's design specifications, which, among other things, called for considerable fill due to the slope onto which the system was being located. Neither of the Defendant's estimates was ever put in writing.

3

10. Each of the Defendant's estimates was, in fact, an estimate, not a firm price, as the fact that each estimate covered a range indicates. The Defendant's intent in providing both the initial estimate and the later one, both at Plaintiff's request, was to enable Plaintiff to understand the likely cost of the septic system.

11. The Plaintiff agreed to hire the Defendant to install the septic system based on his original, lower estimate. It was only after she agreed to hire him that he developed the higher estimate, based on a detailed costing-out of the Colby design. Based on what Defendant told her, the Plaintiff understood the upper end of his estimate to be a "not to exceed" number—based on what Defendant told her, she reasonably believed that her cost for the septic system would not exceed $10,000, with the actual cost up to that limit dependent on the actual cost of Defendant's time and the materials required. However, when he gave her the higher estimate, it can readily be inferred that she did agree to it, because she continued to make payments to him, at least for a while.

12. Plaintiff told Mr. Ramsey where she wanted the driveway to be located. Defendant did not give her any estimate or price for the cost of putting in the driveway, either orally or in writing.

13. Based on all of the evidence, the court concludes that the oral contract between the parties regarding the septic system was that Defendant would install a functional septic system according to the Colby design for a price not to exceed $15,000, with the actual cost up to that ceiling based on actual time spent at $70/hour and the cost of materials. The oral contract regarding the driveway, and any other work on the site requested by Plaintiff, was that Defendant would be paid at $70/hour plus the cost of any materials purchased by him.

14. Mr. Ramsey brought his equipment to the site on August 11th. Mrs. Reno was present that day and every day thereafter throughout the course of Defendant's work. She

4

maintained a calendar on which she kept notes on the number of hours that the defendant and his employee, Jake, worked on the site.

15. The area where the septic system and house were to be placed had been largely cleared before the defendant began work but there were stumps to be removed and some of the larger logs to be shifted from the septic field area. Defendant's equipment quickly proved inadequate for extracting larger tree stumps, and he instructed the Plaintiff to hire another contractor, Ralph Wright, to pull the larger stumps. The Plaintiff did so and paid Mr. Wright herself. Because Defendant was being paid on a time and materials basis for the driveway and other site work, this did not result in extra cost for the Plaintiff.

16. The Defendant advised Plaintiff as he was beginning work on the septic system that two large trees at the northeast corner of the field would have to be removed. Plaintiff paid her son-in-law to cut down the trees and had Ralph Wright return and drag away the logs. The stumps, however, remained in the ground.

17. The Plaintiff made a series of payments to the Defendant consisting of eight separate checks and totaling $28,568. She also paid directly to a materials supplier, Quonset Hardscapes, the sum of $1,936.96 for gravel material to be used by Defendant in the course of his work. Her total expenses for the work to be performed by Mr. Ramsey were therefore $30,504.96.

18. At the time of the first payment, Mrs. Reno asked the Defendant for an accounting of his hours of work and receipts for the material he had purchased for the project. It was at that point that the Defendant revised upward his estimate of the cost of installing the septic system, from a price not to exceed $10,000 to a price not to exceed $15,000. Due to the slope of the site, the Colby design required more fill than the Defendant originally thought. Moreover, Defendant had to do more digging out of roots and rocks than he had anticipated. Despite

5

revising his estimate upward, however, he never prepared a change order or other documentation of the increased cost.

19. The scant invoices which Defendant presented to the Plaintiff were included as Exhibit 4 in the trial notebook and consist simply of a slip marked "petty cash," a date and an amount billed and a notation of "ground work" or "land work" without further specifications.

20. The Town code enforcement officer, Bruce Engert, inspected the septic system installation performed by Defendant on August 24, 2010. Mr. Engert confirmed that the septic system was located in accordance with the design prepared by Mr. Colby.

21. Mr. Engert conducted a second inspection on September 17, 2010, as a result of which he approved the system as it was. Mr. Engert testified at trial that he definitely would not have approved the system without inspecting and confirming that the crushed stone of the appropriate size and depth had been installed below the perforated pipes and that the system was ready to be covered. Mr. Engert found the system (as installed by the Defendant), to comply with the plan prepared by Daniel Colby and the subsurface wastewater disposal rules applicable in the State of Maine. *See* Joint Trial Exhibit 2.

22. The court finds that the Defendant did charge the Plaintiff approximating $15,000 for the septic system, and, for reasons discussed in detail below, that he substantially completed the septic system, but did not fully perform his obligations under the oral contract. Thus, for reasons also discussed in detail below, the court finds that the Plaintiff is entitled to recover the cost over the $15,000 contract ceiling for remedying the minor defects in Defendant's work and finishing the system.

23. At one point during the project, on an afternoon when the Plaintiff had to leave the site for a few hours, Mr. Ramsey excavated a 200 foot long trench across the property and then filled it back in again. He explained to the Plaintiff that he had dug the trench to the location

6

she had designated for a well, just to ensure that a pipe could run from the well to the house site at a sufficient depth below grade. However, the Plaintiff had never designated a location for the well, and had never requested that an exploratory trench be dug. She complained to the Defendant that he had spent machine time on unnecessary work. The court finds that Defendant included this wasted time in his payment requests; that Plaintiff paid for it, and that she is entitled to recover $400 from Defendant for the cost of this unrequested work.

24. Sometime during the last week of September the septic tank was delivered and installed. The septic field area was seeded and covered with hay. During the first week of October the Defendant and his co-worker worked approximately 20 additional hours moving brush and stones around the area where the driveway was to go.

25. As noted above, the work Plaintiff hired Defendant to perform including installing a driveway. Plaintiff claimed to be entitled to a full refund for what she paid Defendant to install the driveway—a claim that would require proof that the entire driveway was in the wrong location. However, the court finds that the Defendant installed a driveway substantially, though not completely, in compliance with the Plaintiff's directive on where the driveway was supposed to be located. Plaintiff was at the site every day monitoring the Defendant's work, and it simply defies common sense to suggest that she sat by and watched Defendant install the driveway in a completely different location than where she had directed him to place it.

26. On the other hand, she did have to pay another contractor $1,700 to complete the driveway in the manner she had directed the Defendant to do, so the court also finds that the Defendant partially breached his oral contract to install a driveway according to Plaintiff's specifications as to location, and thus that Plaintiff is entitled to recover from the Defendant the cost of completing the driveway to her specifications.

7

27. The last day of work by the Defendant was October 8, 2010. Plaintiff told him she had no more money to pay for his work. Although the Defendant points out that the Plaintiff had just spent some of her funds on a tuition payment for her granddaughter, that fact has little relevance to the case. The court infers that Plaintiff told Defendant she had run out of money because she had already paid him far more than he had led her to believe he would charge.

28. Mr. Ramsey did not return to the job site and Mrs. Reno persisted in her requests for his records and for an accounting of what he service he had performed and what hours he had worked. She testified that the Defendant's refusal to give her satisfactory documentation of the work performed and the price paid prevented her from obtaining a loan to finance completion of her home.

29. After the Defendant discontinued work on the project, the Plaintiff continued with family and other individuals, excavating a cellar in December, 2010, (with her own back hoe), and having a foundation installed for the planned home. The following year she located and purchased a used double-wide mobile home, and had it placed on the foundation. It was not the proper dimension for the foundation and there were significant problems with the condition of the mobile home. After a state inspection, and action by the Attorney General's office, the seller agreed to remove it and reimburse the Plaintiff $15,000.

30. Plaintiff attempted to obtain bank financing to continue with the construction of her house. She again asked the Defendant for an accounting of his work in connection with securing financing, and the Defendant ignored or refused her request. Plaintiff has since put up a stick-built shell, but has never completed the home. There is no indoor plumbing, no well, and the septic system has never been in use. The septic system is missing connections—no pipe runs from the house to the septic tank, nor from the tank to the distribution box.

31. Plaintiff's complaint against the Defendant, Thomas Ramsay, alleges four counts:

8

breach of contract, breach of implied warranty, violation of the unfair trade practices act, and negligence.

32. In order to prove that the Defendant breached the contract to install the septic system in an appropriate manner or breached an implied warranty of merchantability, the Plaintiff must prove that the Defendant breached the applicable standard of care and failed to perform the work in question in a workmanlike manner. *See Paine v. Spottiswood,* 612 A.2d 235 (Me. 1992). Ordinarily, to establish that a professional contractor violated an applicable standard of care or state regulation, expert testimony is necessary. *Seven Tree Manor Inc. v. Kallberg,* 688 A.2d 916 (Me. 1997).

33. Although Plaintiff claims the septic system installed by Defendant is not located where it was supposed to be, that claim is not supported—and in fact is contradicted—by the evidence. Mr. Engert checked the location during his first inspection, to confirm it was sited as called for in the Colby design. The Plaintiff's expert, Jack Shaw, could not determine whether the system was located correctly because necessary reference points on the face of the earth had been removed.

34. Mr. Shaw was hired by the Plaintiff to do an evaluation of the system and assess its compliance with the state requirements. He stated that his inspection found less than the required amount of crushed stone placed under the distribution pipes in some areas of the bed. He found that the soil used in the area around the field was not of the type specified in the permit and required by the applicable regulations. He described a large boulder that he had uncovered in his inspection (joint trial Exhibit 15, photograph marked "Engert #"). He testified that the stumps that had been left in the fill extension area were also not in compliance with the state requirements, and could result in a system failure over the course of time. Mr. Shaw provided an estimate of $12,500 to remove and replace the system.

9

35. The Defendant's expert witness was Gerald Mitchell, a licensed site evaluator. Like Mr. Shaw, Mr. Mitchell performed an inspection of the subject property on August 23, 2014, after Mr. Shaw's work at the site. Mr. Mitchell hand dug three random test holes. Two of them revealed the appropriate amount of crushed stone beneath the pipes but the hole closest to the sloping along the road revealed only eight inches of stone beneath the pipes. Mr. Mitchell also found some hard clay beneath the stone in that location. However, Mr. Mitchell testified that the clay or "hard pan" is not something that the installer, in this case the Defendant, can be held responsible for as it is the job of the septic system designer (Mr. Colby) to make certain that the plan allows for appropriate soil composition to the necessary depth before installation of pipes and/or fill.

36. Likewise, given the lack of reference points for locating the perimeter of the system within the Colby plan, it was Mr. Mitchell's opinion that the inadequate amount of gravel in the hole nearest the road would not be the fault of the installer and that the gravel could well have moved given the amount of vehicular traffic (including a heavy excavator) that reportedly has traversed the area above the test hole since the original installation of the system in 2010.

37. Mr. Mitchell also testified that it would be impossible for anyone to attribute mottling and/or water intrusion within the current location of the septic system to any improper installation by the Defendant given the massive disturbance of the area created by the eight large test pits created by Mr. Shaw during April of 2013 and given the amount of vehicular traffic that reportedly has occurred prior to that date.

38. In Mr. Mitchell's opinion, too much time and too much change in the composition of the fill has occurred to determine whether any water intrusion observed in either 2013 or 2014 would have been a problem had the system originally installed by Defendant in 2010 been left intact and undisturbed.

10

39. With regard to the stumps described by Mr. Shaw, Mr. Mitchell was able to locate only one of the alleged stumps during his inspection. Based on the testimony of Mr. Shaw, any large tree stumps within the area encompassed by a septic system should be removed in the course of installing the system, and that the Defendant's failure to remove this stump—even assuming the system was properly located—constituted a breach of his oral contract to install the septic system. In addition, in promising to install Plaintiff's septic system, the Defendant made an implied warranty that the system would be installed correctly, and the stump left by him constitutes a breach of that warranty.

40. On the other hand, based on Mr. Engert's approval of the septic system and on Mr. Mitchell's and Mr. Shaw's testimony, the court finds that the septic system installed by Defendant was substantially complete and functional, although the court further finds that one of the stumps mentioned by Mr. Shaw, and the rock or boulder also mentioned by him, should have been removed to optimize functioning of the septic system. Also, some connections needed to be installed to finish the system.

41. Because the Plaintiff has paid the Defendant the entire $15,000 he was entitled to charge for installing the septic system, and because the system was substantially but not entirely complete and functional, Plaintiff is entitled to recover damages for breach of the oral contract in the amount of the cost of repair or remediation, but is not entitled to the cost of replacing the entire system.

42. Based on the expert testimony of Mr. Shaw, the court finds that one tree stump and boulder should have been removed. The court also finds and concludes that the septic system was not completely functional or ready to be hooked up to a pipe from the residence, in that it lacked a connecting pipe between the septic tank and the distribution box. The court finds the cost of remedying all these defects to be $1,500.

11

43.  Defendant argues that, even if the septic system was not properly installed, the Plaintiff should not recover anything because she later installed a foundation too close to the septic system to be remediated.   The court does not accept this argument, mainly because, if the foundation is indeed too close to the septic system, the foundation can be relocated or used for another purpose

44.  As to the cost of the gravel that Plaintiff purchased from Quonset Hardscapes, the evidence was unclear as whether the gravel was for use in or around the septic system, or for the driveway.  However, given the court's findings that both the septic system and the driveway were substantially—but not completely—in compliance with the oral contract, the court finds the Quonset gravel was not wasted and therefore that Plaintiff is not entitled to recover her cost of purchasing it.

45.  For purposes of unfair trade practices act claim in the Plaintiff's complaint, the Defendant provided excavating and septic installation services to the Plaintiff, activity that falls within the purview of the Home Construction Contract Act (HCCA), 10 M.R.S. § 1486 *et seq.* *See Parker v. Ayer*, 612 A.2d 1283, 1284 (Me.1992).  The amount paid by the Plaintiff is in excess of the $3,000 threshold for application of the Act.  10 M.R.S. § 1486.

46.  The Defendant failed to provide Plaintiff with a written contract as required by section 1487 of the Act, 10 M.R.S. § 1486.  In the present case, a written contract compliant with the Home Construction Contract Act would have set forth the specifications and location for the driveway, the price to be charged, or at least an estimated price, for the septic system installation and the hourly rate which the Defendant was charging for his machine time.

47.  Likewise, the Defendant failed to provide Plaintiff with any written change order reflecting the increase in his estimate of the cost of the septic system.   "Any alteration or deviation from the above contractual specifications that results in a revision of the contract

price will be executed only upon the parties entering into a written change order." *See* 10 M.R.S. § 1087(9). This provision plainly requires a written change order for any additional work to be executed before the work is done.

48. Violations of the HCCA entitle the homeowner to statutory civil penalties of between $100 and $1,000 per violation, *see* 10 M.R.S. § 1490(2), and also constitute *prima facie* violations of the Maine Unfair Trade Practices Act, 5 M.R.S. § 206. *See id.* § 1490(1).

49. Defendant is in the business of providing excavating and septic installation service, and Plaintiff is a consumer, for purposes of the UTPA. Plaintiff's prior attorney sent a letter to the Defendant on September 27, 2011 (Plaintiff's Exhibit 1), thereby satisfying the requirements of section 213 (1-A). The parties and counsel met on June 12, 2012 to discuss the claim. The Defendant had ample notice of the claim against him 30 days prior to the filing of Plaintiff's complaint herein.

50. The Defendant's failure to provide a written contract, to specify (verbally or in writing) the hourly rate he was billing for the use of his machinery, to provide any change orders, along his refusal to provide meaningful documentation with his demands for payment, his refusal to install the driveway where he had been instructed constitute violations of the HCCA.

51. Moreover, the court finds that the Defendant's HCCA violations caused Plaintiff financial loss—had the Defendant complied with the HCCA in providing a written contract, his error in not providing the driveway that Plaintiff had specified would not have occurred.

52. The court does not find that the Defendant acted deceptively or in bad faith. Rather, his casual course of dealing with the Plaintiff was based on their long friendship. However, deception and bad faith are not essential prerequisites to a UTPA violation. In *State v. Weinschenk*, the Law Court commented as follows:

13

To justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition . . . An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances. A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product. An act or practice may be deceptive, within the meaning of Maine's UTPA, regardless of a defendant's good faith or lack of intent to deceive.

*State v. Weinschenk*, 2005 ME 28, ¶¶ 16-17, 868 A.2d 200, 206.

53. In sum, an act or omission need not be fraudulent, intentionally deceptive or made in bad faith in order to be violative of the UTPA. The court finds and concludes that, notwithstanding the absence of bad faith or intentionally misleading conduct on the part of the Defendant, that his complete failure to document his dealings with the Plaintiff as required by the HCCA constitutes a violation of the UTPA.

54. Although there is room to conclude that the Defendant violated the HCCA in multiple ways, the court treats Defendant as having violated the HCCA two times—once for failing to provide any written contract initially and again for failing to issue any written change order. Because the violations were more than technical ones—i.e., this is not a case where there was a written contract that did not comport entirely with the UTPA, as, for instance, omitting the required dispute resolution provision—the court sets the amount of penalty for each violation at $1,000.

55. The UTPA provides that 'if the Court finds ... that there has been a violation of section 207, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorney fees and costs incurred in connection with said action." An award of attorney fees pursuant to the UTPA is recoverable only to the extent that it is earned pursuing a valid UTPA claim. *See Beaulieu v. Dorsey*, 562 A.2d 678, 679 (Me.1989).

14

56. Plaintiff claims $29,307.32 in attorney fees and costs, but the court determines that she is only entitled to recover $7,500 in fees and $500 in costs, because she failed to prove most of her claims. She sought judgment for $12,500 plus the $1,963.36 paid by the Plaintiff for gravel used by the Defendant to access the septic area, plus $14,105, the additional amount paid by Plaintiff to Defendant for her driveway and work clearing the property. In effect, she sought a complete refund of everything she paid Defendant, but proved that she is entitled to only a fraction of that amount in actual damages.

57. Accordingly, Plaintiff is entitled to judgment against Defendant for a total of $13,600 as follows:

- $3,600 in actual damages for breach of contract and breach of implied warranty, consisting of $1,700 paid to another contractor for finishing the driveway; $400 paid to Defendant for the wasted trench work, and $1,500 for the cost of remediating and completing the septic system

- $2,000 in HCCA penalties

- $7,500 in attorney fees pursuant to HCCA and UTPA, with attorney fees awarded on the basis of the portion of fees attributable to the claims on which Plaintiff prevailed. *See Mancini v. Scott*, 2000 ME 19, ¶ 10, 744 A.2d 1057, 1061, *citing Poussard v. Comm. Credit Plan, Inc. of Lewiston*, 479 A.2d 881, 884 (Me. 1984).

- $500 in court costs, reflecting the extent to which she prevailed on her claims

IT IS HEREBY ORDERED AS FOLLOWS: Judgment is hereby awarded to Plaintiff Marilyn Reno against Defendant Thomas Ramsey in the amount of $13,600, including attorney fees and costs, with pre-judgment and post-judgment interest as allowed by law.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated February 26, 2015

A. M. Horton
Justice, Superior Court
sitting by designation

15

```
MARILYN RENO  - PLAINTIFF                          DISTRICT COURT
PO BOX 494                                         WEST BATH
WOOLWICH ME 04579                                  Docket No   WESDC-CV-2013-00069
Attorney for: MARILYN RENO
JAMES WHITTEMORE  - RETAINED
JAMES M WHITTEMORE PA                              DOCKET RECORD
155 PARK ROWE
BRUNSWICK ME 04011


vs

THOMAS RAMSEY  - DEFENDANT
71 NORTHWOOD ROAD
WEST BATH ME 04530
Attorney for: THOMAS RAMSEY
JOHN F BARNICLE  - WITHDRAWN 02/24/2014
MONCURE & BARNICLE
9 BOWDOIN MILL ISLAND
PO BOX 636
BRUNSWICK ME 04011

Attorney for: THOMAS RAMSEY
PAUL DOUGLASS  - RETAINED
PAUL S DOUGLASS PA
471 MAIN STREET
PO BOX 1346
LEWISTON ME 04243-1346


Filing Document: COMPLAINT            Minor Case Type: CONTRACT
Filing Date: 03/13/2013
```